FORST, J.,
concurring in part and dissenting in part.
I concur with respect to the holding that the trial court erred in imposing a public defender fee without notice. However, I respectfully disagree with the majority opinion that the trial judge erred in' reducing the charge of aggravated battery to attempted aggravated battery rather than simple battery. Florida Rule of Criminal Procedure 3.510(b) states in pertinent, part that “[t]he judge shall not instruct on any lesser included offense as to which there is no evidence” (emphasis added). In the instant case, I cannot conclude that there was “no evidence” on which a jury could find the defendant guilty of attempted aggravated battery.
* The victim testified that he had left the bus terminal and had begun walking to work when a man he later identified as Appellant Michael Smith approached him on the sidewalk and asked for a cigarette. The victim pulled out a cigarette and gave it to him. Smith asked the victim “do you believe in God,” and the victim responded “sometimes.” After taking a step and a half away from Smith, the victim felt an arm around his neck, another arm behind his head, and his legs “being kicked out from under” him. Several minutes later, the victim awoke on the sidewalk. He noticed that his wallet and cigarettes were gone and that there was‘blood coming from a cut on his arm. • '
As noted in the majority opinion, in response to Smith's motion for'judgment of acquittal on the charge of aggravated battery; the trial court reduced the charge to attempted aggravated battery and the jury entered a verdict of guilty. On appeal, Smith raises the following question: does the record support the trial court’s decision to submit the charge of attempted aggravated battery to the jury; i.e., was there any (the opposite of ho) evidence presented during the state’s case, viewed in a manner to affirm the trial court’s decisión, that Smith intended to cause the victim great bodily harm, permanent disability, or permanent disfigurement as required by section 784.045(l)(a)l, Florida Statutes (2012), when he applied this chokehold[3] to the victim?
A “sleeper hold” is a finishing move in professional wrestling. A professional wrestling sleeper hold is not intended to cause the victim great bodily harm, as *910 professional wrestling is choreographed entertainment. A chokehold applied by a mugger on a sidewalk, however, is very real. As U.S. Supreme Court Justice Thurgood Marshall described:
It is undisputed that chokeholds pose a high and unpredictable risk of serious injury or death. Chokeholds are intended to bring a subject under control by causing pain and rendering him unconscious. Depending on the position of the officer’s arm and the force applied, the victim’s voluntary or involuntary reaction, and his state of health, an officer may inadvertently crush the victim’s larynx, trachea, or thyroid. The result may be death caused by either cardiac arrest or asphyxiation. An LAPD officer described the reaction of a person to being choked as “do[ing] the chicken,” in reference apparently to the reactions of a chicken when its neck is wrung. The victim experiences extreme pain. His face turns blue as he is deprived of oxygen, he goes into spasmodic convulsions, his eyes roll back, his body wriggles, his feet kick up and down, and his arms move about wildly.
City of Los Angeles v. Lyons, 461 U.S. 95, 116-18, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (Marshall, J., dissenting) (footnote and citations omitted);[4] see also Keyes v. State, 95 So.3d 280, 282-83 (Fla. 4th DCA 2012) (noting that the medical examiner who testified “discussed a study showing that a disproportionate number of middle-aged men died when a sleeper hold was applied”); Zellars v. State, 707 So.2d 345, 347-48 (Fla. 5th DCA 1998) (Cobb, J., concurring) (“It is an obvious fact that death can result from choking; that could be judicially noted without any medical testimony at all.”).
In Zellars, the concurring judge’s decision to join in affirming the attempted aggravated battery conviction was premised on “one factor, and that [was] the state’s evidence that Zellars did not voluntarily release the victim but retained his grip for some two to three minutes until physically forced away by an intervening third party, with whom he then engaged in a fight.” Id. at 348. In the instant case, Smith apparently released his grip only after the victim lost consciousness, at which time he dropped the victim to the ground with such force as to draw blood from his arm. Instead of an intervening third party causing the release of the assailant’s grip, the intervening event in this case was the victim’s loss of consciousness.
Sometimes, as may be the case here, the loss of consciousness is for a small amount of time and no “great bodily harm” results. At other times, as set forth by Justice Marshall’s Lyons opinion, the loss of consciousness is permanent. Retaining a chokehold/sleeper hold on an individual until the victim loses consciousness is inherently dangerous and clearly demonstrates such a reckless disregard for the victim’s well-being that a jury could use it as circumstantial evidence of intent on the part of an individual who did not know the victim and was, in fact, about to rob him (thus, there was no possibility that Smith and the victim were merely “roughhousing”). “[Ijntent is a jury question, not *911 properly decided on a motion to dismiss ... that cannot be ascertained from' direct evidence but only inferred from the acts of parties and surrounding circumstances.” State v. Franchi, 746 So.2d 1126, 1128 (Fla. 4th DCA 1999). As such, there was no error in the trial court sending the charge of attempted aggravated battery to the jury. Accordingly, I dissent.

. "[A] method of holding someone by putting your arm around the person's neck with enough pressure to make breathing difficult or impossible.” Chokehold, Merriam-Webster, http://www.merriam-webster.com/dictionary/ chokehold (last visited Sept. 2, 2015).

. Lyons involved a claim for injunctive relief filed by an individual who was injured as the result of a chokehold administered by a Los Angeles police officer. Although Justice Marshall wrote for a four-Justice minority with respect to the injunction issue, there is nothing in the majority’s opinion that conflicts with Justice Marshall’s narrative on the risks associated with use of a chokehold. In fact, the Court’s majority opinion noted that, in the five years following the filing of Lyons’s complaint, there had been fifteen deaths associated with the administration of chokeholds by the Los Angeles police. Lyons, 461 U.S. at 100.